LYLE S. HOSODA            3964-0
KOURTNEY H. WONG         10827-0
SPENCER J. LAU           11105-0
THURSTON A. KINO         11558-0
HOSODA LAW GROUP
Attorneys at Law, A Law Corporation
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawai`i 96813
Telephone: (808) 524-3700
Facsimile: (808) 524-3838
Email: lsh@hosodalaw.com
khw@hosodalaw.com; sjl@hosodalaw.com

KRISTINA S. BAEHR    *Pro Hac Vice (pending)*
JAMES BAEHR          *Pro Hac Vice (pending)*
JUST WELL LAW, PLLC
2606 W 8th St, Unit 2
Austin, TX 78703
Telephone: (512) 994-6241
Email: kristina@well.law; jim@well.law

*Attorneys for the plaintiffs*

*(case caption continued on next page)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| PATRICK FEINDT, JR., Individually, and as Next Friend to his minor children P.G.F. and P.R.F, NASTASIA FREEMAN, Individually, and as Next Friend to her minor children, K.F., D.F., and N.F., JAMIE SIMIC, Individually, and as Next Friend to her minor children, M.S. and J.S., and ARIANA WYATT, Individually, and as Next Friend to her minor child, I.W., JANE and JOHN DOES 1-1000, and as Next Friends to their minor children,[1];<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL NO. 1:22-cv-397<br><br>(FEDERAL TORT CLAIMS ACT)<br><br>COMPLAINT |

**COMPLAINT**

When four-year old I.W. has to explain what happened to her, why the "butterfly" in her neck is swollen, and her hair falls out, and the blood draws make her cry, she tells them, "It's because I drank the bad water." It's the same reason

---

[1] There are hundreds of additional claims in the administrative process of the Federal Tort Claims Act, including civilians. Every person who ingested water contaminated by Red Hill was harmed in some capacity by the negligence of the United States. They will be added to this lawsuit when their claims are ripe for adjudication.

i

that pain radiates up and down Patrick Feindt's abdomen and flank as the former professional golfer heads in for a surgery, five medical procedures down. It's the same reason Nastasia Freeman spent her family savings to get off the island but still experiences multiple seizures a day that leaves her waking up with her mouth bloody and her mind blank. It's the same reason Jamie Simic weighs less than 98 pounds and tells her children the things they need to know when she passes. They all drank the bad water.

Throughout 2021, as more than 93,000 military service members, their family members, and civilians relied on the government for safe water on the island of O`ahu, the Navy harbored toxic secrets. As the Feindt, Freeman, Simic, and Wyatt families and too many others like them would discover, the water they drank and bathed in was dangerously contaminated. And government officials knew all along. In at least two separate incidents, May 6 and November 20, 2021, United States personnel at Red Hill Bulk Fuel Storage Facility made negligent errors that released jet fuel and other toxic contaminants directly into the Navy water line. While the government failed to disclose the contamination as required by federal law, these families continued to ingest and immerse themselves in the toxic water.

As these families became sicker from the water, the government compounded the families' suffering. First, Navy leadership denied and dismissed

ii

their concerns. The families' questions and concerns were ignored or minimized. Then the Navy denied the families even the most basic standard of care when they turned to military medical providers for help. Military facilities recorded symptoms but failed to run standard labs to check liver function, kidney function, and complete blood count. Even now, as the families' medical bills and home-related expenses mount, the United States has offered them no environmental health care.

The Feindt, Freeman, Simic, and Wyatt families were forced to evacuate their homes to stay in hotels for months. Then they were forced to move back into those contaminated homes, only to immediately get sick again. Ultimately, each family evacuated a second time to seek refuge off the island of O`ahu. But their health nightmares continue. As of the date of filing, the once-healthy adults and children have been treated—and even hospitalized—for seizures, gastrointestinal disorders, neurological issues, burns, rashes, lesions, thyroid abnormalities (in two young girls), migraines, neurobehavioral challenges, and other maladies. The government's failure to offer proper medical treatment has compounded their trauma and frightening, frustrating chases in search of appropriate medical specialists. In each family, at least one adult has had to leave their employment, leave military service, or suffer other adverse professional actions as they and their family attempt to get well. And these families rightly fear this is only the beginning. They now are more vulnerable to a variety of conditions going forward.

iii

The Federal Tort Claims Act offers a legal remedy. Those who have been harmed by the negligence of the United States are entitled to compensation for the harm. And, indeed, this case is what the Federal Tort Claims Act was designed for.

The case arises out of the negligence by the United States of America and its agencies that caused the poisoning of the water supply with jet fuel at Red Hill, Hawai`i on or about May 6 and November 20, 2021, and failed to provide appropriate treatment thereafter. The plaintiffs, Patrick Feindt, Jr., individually, and as Next Friend to his minor children P.G.F. and P.R.F., Nastasia Freeman, individually, and as Next Friend to her minor children, K.F., D.F., and N.F., Jamie Simic, individually, and as Next Friend to her minor children, M.S. and J.S., and Ariana Wyatt, individually, and as Next Friend to her minor child, I.W., JANE and JOHN DOES 1-1000, and as Next Friends to their minor children, bring this Complaint under the Federal Torts Claims Act, 28 U.S.C. § 2674.

iv

TABLE OF CONTENTS

NATURE OF THE CASE ..................................................................................1

PARTIES .........................................................................................................1

FACTUAL BACKGROUND............................................................................2

    A.  On May 6, 2021, the negligent "operator error" of a federal officer caused a 19,000 gallon fuel leak into the fire suppression system at Red Hill. ..................................................................................................4

    B.  On November 20, 2021, another negligent "operator error" of a federal officer       caused a train cart to strike and break a pipe valve that erupted in a blast that injected thousands of gallons of fuel into the Red Hill water system. ...............................................................................................7

    C.  The Safe Drinking Water Act and EPA regulations required the Navy to warn. .................................................................................................11

    D.  After the blast, the Navy failed to warn residents of the danger.................13

    E.  The Navy did not announce the leak until December 2, 2021— twelve days after the blast. ..........................................................................15

    F.  The Navy itself accepted responsibility for the blast and failure to warn. .................................................................................................16

    G.  The Navy knew it was not safely operating the Red Hill fuel tank system. ..........................................................................................17

    H.  The Navy's "flushing" and other cleanup efforts added insult to injury for affected families and compounded the toxic harm...............................20

    I.  Federal officers failed to provide appropriate medical care to families affected, compounding injuries that the Navy had caused..........................24

    J.  The Navy's operations at Red Hill likely violated additional regulations. ..........................................................................................26

    K.  Affected families have suffered extraordinary harm and fear. ....................28

a. The Feindt Family .........................................................................28

b. The Freeman Family ......................................................................31

c. The Simic Family ...........................................................................35

d. The Wyatt Family...........................................................................38

CAUSES OF ACTION .............................................................................41

    COUNT 1: NEGLIGENCE ......................................................................41

    COUNT II: NUISANCE ..........................................................................43

    COUNT III: MEDICAL NEGLIGENCE, FAILURE TO TREAT, DELAYED CARE..........45

    COUNT IV: INFLICTION OF EMOTIONAL DISTRESS .................................46

CAUSATION.............................................................................................47

NO EXCEPTIONS APPLY........................................................................49

JURISDICTION, VENUE & SERVICE....................................................50

CONDITIONS PRECEDENT ...................................................................52

DAMAGES.................................................................................................53

PRAYER.....................................................................................................54

**NATURE OF THE CASE**

1.     This complaint is filed pursuant to the provisions of the Federal Tort Claims Act, Title 28, U.S.C §§ 1346(b), 2671, *et seq.*, against the United States of America for negligence, nuisance, medical malpractice, and intentional infliction of emotional distress resulting in physical and emotional injuries where the government of the United States of America, if a private party, would be liable to the plaintiffs.

**PARTIES**

2.     Plaintiffs, Patrick Feindt, Jr., P.G.F., and P.R.F., reside in Colorado and previously resided in Hawai`i within the jurisdiction of this Court during acts or omissions alleged herein.

3.     Plaintiffs, Nastasia Freeman, K.F, D.F., and N.F., reside in California and previously resided in Hawai`i within the jurisdiction of this Court during acts or omissions alleged herein.

4.     Plaintiffs, Jamie Simic, M.S., and J.S., reside in Florida and previously resided in Hawai`i within the jurisdiction of this Court during acts or omissions alleged herein.

5.     Plaintiffs, Ariana Wyatt and I.W. reside in Alabama and previously resided in Hawai`i, within the jurisdiction of this Court.

6.     Each plaintiff resided in a home with water provided by the Red Hill

1

shaft that was owned and operated by the United States Department of the Navy during the time frame of acts or omissions alleged herein.

7.      Defendant is the United States of America.

## FACTUAL BACKGROUND

8.      On at least two separate occasions, on May 6 and November 20, 2021, United States personnel at Red Hill Bulk Fuel Storage Facility (Red Hill Facility) made negligent errors that released thousands of gallons of jet fuel and other contaminants into the drinking water of families on the Navy water line on the island of O`ahu. Because government personnel then failed to disclose those leaks as required, the plaintiffs continued to ingest jet fuel and became sick from that exposure. Instead of promptly and appropriately addressing the harm, government officials conducted a woefully inadequate clean-up and clearing effort, while government doctors provided medical care far below the standard of care. The plaintiffs continue to suffer from severe illness, inconvenience, trauma, and fear.

9.      The needless and foreseeable leaks at the Red Hill Facility were caused by a specific series of negligent actions by federal officers. Congress foresaw and passed laws to avoid precisely this harm, and the Navy is and was bound by specific statutes, regulations, orders, and decrees that were ignored or violated. The specific nature and extent of those violations will be further delineated through jurisdictional discovery.

2

10. The Navy owns and operates the Red Hill Facility on the island of O`ahu, Hawai`i to maintain strategic fuel reserves in the Pacific. The facility has been operational since 1943 and consists of 20 steel-lined tanks that measure 100 feet in diameter, 250 feet high, and can hold 12.5 million gallons of fuel each. Altogether, these underground storage tanks can store up to 250 million gallons of fuel. The tanks are connected to three pipelines that run 2.5 miles through a concrete tunnel to fueling piers at Pearl Harbor.

11. The Red Hill Facility currently stores and dispenses at least three types of fuels – necessary for powering military assets but toxic if imbibed by humans. Fuels currently stored in the tanks include marine diesel for ships and two types of jet fuel, Jet Propellant-5 (JP-5) and Jet Propellant-8 (JP-8). "Chemicals of concern" in these fuels include "total petroleum hydrocarbons (TPH), benzene, toluene, ethylbenzene, xylenes, naphthalene, and methylnaphthalenes" according to the Environmental Protection Agency (EPA).

12. EPA Region 9 is responsible for monitoring the Red Hill Facility and ensuring compliance with all federal water regulations.

13. The Navy also owns and operates a water system that pumps water from underground aquifers to provide drinking water to the military community and facilities associated with Joint Base Pearl Harbor-Hickam (JBPHH), including military housing that is run as a public-private venture. Three wells supply the

3

Navy's drinking water system: the Red Hill Shaft, Navy Aiea-Halawa Shaft, and Waiawa Shaft.

14.     The Red Hill Facility sits 100 feet above an aquifer that supplies drinking water to approximately 763,000 Oahu residents, according to the EPA.

**A. On May 6, 2021, the negligent "operator error" of a federal officer caused a 19,000 gallon fuel leak into the fire suppression system at Red Hill.**

15.     On May 6, 2021, a Control Room Operator and United States Government employee at Red Hill failed to follow the required valve opening and closing sequence and released what the Navy then said was approximately 1,618 gallons of jet fuel. An initial command investigation determined that this failure was due to "operator error" – a breach of the standard of care and safety protocol. This safety violation was not discretionary and involved no weighing of policy considerations.

16.     The Navy then claimed the majority of the fuel had been recovered and denied that the leak contaminated any drinking water. But at a December 22, 2021, State of Hawai`i Department of Health (DOH) hearing, Captain James Meyer, USN, Commander of the Navy Facilities Engineering Command, revised the estimate of the amount spilled from 1,600 gallons to 19,000 gallons.

17.     The Navy identified the root cause of the May 6 incident to be a "disregard of proper valve sequencing dictated in the specific Operations Orders,"

4

as well as several other factors, all of which could have been prevented by proper adherence to the rules.

18.     In an October 27, 2021, interview on Hawai`i Public Radio, Captains Gordie Meyer and Albert Hornyak, United States Navy, explained what happened. Captain Hornyak noted that, "[e]rrors on the part of the Red Hill system operator was the primary cause of the release… Specifically, the system operator not clos[ing] all of the valves as specified in the Operations Order before beginning a fuel transfer." Interview with Navy Capts. Gordie Meyer and Bert Kornyak, Hawai`i Public Radio (Jan. 12, 2022), https://www.hawaiipublicradio.org/local-news/2021-10-27/navy-says-operator-error-was-the-cause-of-a-may-fuel-leak-from-the-red-hill-storage-facility, *see also* https://fb.watch/fcQOdUe319/. Both men clarified that the acts were committed by government employees, not contractors, with Captain Meyer stating, "The 6 May event was by operators who are government employees…" *Id.*

19.     An October 2021 Mitigations Report prescribed corrective actions, including proper construction of the pipeline system, safety alarms to be restored and updated to proper working order, and clear instructions to follow the existing rules set forth by the Department of Defense. The operators of the Red Hill facility did not implement the corrective actions outlined in the Mitigations Report. The failure to take the required corrective actions led to devastating results in

5

November 2021.

20.     In the meantime, evidence mounted that the May event contaminated the plaintiffs' water. After the May 6 release event, tests at the Red Hill Shaft showed elevated readings that exceeded environmental action levels on multiple occasions:



Exhibit D24, *Dept. of Health v. U.S. Dept. of Navy,* Dkt. No. 21-UST-EA-02 (Dec. 21, 2021), https://context-cdn.washingtonpost.com/notes/prod/default/documents/c6559605-8d53-46db-9d2a-db32a3a2bb57/note/5ff07162-772e-4cb5-bc28-72d2eefc2284.

21.     The Navy did not reveal these elevated test results to the state for months according to state environmental health officials. Alex Horton and Karoun

6

Demirjian, *Military families say they were ill months before jet-fuel leak brought scrutiny to Pearl Harbor's tap water*, WASH. POST (Dec. 21, 2021), https://www.washingtonpost.com/national-security/2021/12/21/pearl-harbor-water-contamination/. "This is an early warning sign of something going on. And yet the [health] department was not aware of it, which is a concern," said one such official, Felix Grange. *Id.* Following the May spill, many families showed up at hospitals to report symptoms such as eczema, rashes, skin breakouts, stomach conditions, nausea, headaches, forgetfulness, and extreme fatigue: symptoms known to be consistent with fuel exposure. *Id.*

**B. On November 20, 2021, another negligent "operator error" of a federal officer caused a train cart to strike and break a pipe valve that erupted in a blast that injected thousands of gallons of fuel into the Red Hill water system.**

22.    On November 20, 2021, a United States Government employee operating a train cart negligently struck a fire suppression discharge pipe that contained thousands of gallons of fuel and water from the May 6 error. The damage triggered a catastrophic spill that injected jet fuel into the Red Hill well, the drinking water source for the plaintiffs.

23.    Although the Navy initially claimed that there was no video coverage of the event, a source leaked a video:

7



Civil Beat, *Fuel Leak at the Navy's Red Hill Facility Nov. 20, 2021,* Youtube,

https://www.youtube.com/watch?v=GEGohRlLrSA&t=3s

24.    Admiral Samuel Paparo, USN, Commander of the U.S. Pacific Fleet,

ordered a command investigation of the incident that was endorsed by him on

January 20, 2022, and on June 6, 2022, by the Vice Chief of Naval Operations. The

report broadly confirmed the findings of the first investigation. S.J. Paparo, *First*

*Endorsement of RDML Christopher J. Cavanaugh, USN, ltr 5830 of 14 Jan 22 w/*

*encl: Command Investigation into the 6 May 2021 and 20 November 2021*

*Incidents at Red Hill Bulk Fuel Storage Facility*, (Jan. 20, 2022),

https://www.documentcloud.org/documents/22077265-foia-release-red-hill-ci-

june-2022 (hereinafter, Cavanaugh Report).

25.    The report confirmed the Navy's culpability under the FTCA for both

8

incidents. "The Navy is responsible for the 6 May 2021 and 20 November 2021 fuel spills at the Red Hill Bulk Fuel Storage Facility . . . and subsequent water contamination," the Cavanaugh Report reads. "[H]uman error was the primary cause" of both fuel spills "which led to as much as 3,322 gallons[2] of fuel contaminating the Navy drinking water system." *Id.*

26.    The human errors (negligence) were further delineated in the Findings of Fact and Opinions (emphases added) in the reports:

Finding of Fact 41: "On 6 May, 2021, Red Hill operators *improperly* executed a fuel transfer procedure, resulting in two piping joint ruptures and subsequent JP-5 fuel spill. Although unknown at the time, a fire suppression system sump pump transferred most of the fuel [up to 16,999 gallons] into a retention line, where it remained until 20 November."

Finding of Fact 174: "On 20 November 2021, the Red Hill over *inadvertently* struck a fire suppression system retention line drain valve with the passenger cart of a train, cracking the PVC pipe near Adit 3. Although not known at the time, this retention line contained up to 16,999 gallons of JP-5 fuel from the 6 May spill. A portion of his fuel was released to the environment and ultimately entered the Red Hill well and the Navy water distribution system." Appendix C notes: "A total of 3,322 gallons of remain unaccounted for, and some or all of that fuel contaminated the Red Hill well and Navy water distribution system."

Opinion 1: "The proximate cause of the fuel spill on 6 May 2021 was *human error*. The [Control Room Operator] and pump operator took *intentional shortcuts* when transitioning between procedures. Their improper valve operations resulted in drawing a vacuum in the JP-5 line, then rapidly pressurizing it. This pressure surge caused mechanical

---

[2] This was later increased to 5,542 gallons noted as "unrecovered" in the Cavanaugh Report.

9

failure of two piping joints. This opinion is consistent with a root cause analysis conducted by Austin Brockenbrough and Associates, LLC, a private engineering and consulting firm."

Opinion 20. "The proximate cause of the fuel spilled from the fire suppression system retention line on 20 November 2021 was a failure to properly account for the fuel spilled on 6 May 2021 (*human error*) . . ."

Opinion 21: "The Red Hill over *inadvertently* struck the drain valve hand wheel with the passenger cart of a train, causing the PVC pipe to crack and leak. This train is used to transit the tunnel system and likely contacted the valve hand wheel multiple times, weakening and finally cracking the pipe. FLC Pearl Harbor conducted a preliminary inquiry regarding this event, and the report postulates *excessive speed* may have caused the train to jump. The investigation team assesses it is more likely that the weight of fuel in the 14-inch diameter PVC pipe caused it to sag over time. Worn paint on the hand wheel suggests the train rubbed against it on several occasions…"

Opinion 30: "The proximate cause of contaminated drinking water was a failure to properly respond to the fuel spill on 20 November 2021 (*human error*)."

*Id.*

27.    These Findings of Fact and Opinions establish negligence and lack of due care on the part of government personnel. The operative actions are not discretionary functions – the federal operators had no discretion to "improperly" transfer fuel by violating a required procedure or to operate a train in a manner that it would "inadvertently" strike and crack pipes. There was no weighing of policy or intentional decisions here—just negligence on the part of federal employees.

28.    Moreover, the material of the pipes contributed to the explosion. The Navy violated the Department of Defense requirement to use steel pipes for fuel

10

transmission. The Unified Facilities Criteria specifications for the Department of Defense's Fire Protection Engineering for Facilities, UFC 3-60-01, Section 9-9.2.1 . . . mandate "schedule 40 steel pipe" for such fire suppression systems like the AFFF system at the Red Hill Facility. Department of Defense Fire Protection Engineering for Facilities, UFC 3-60-01 (8 August 2016 as amended in 2020), https://wbdg.org/FFC/DOD/UFC/ARCHIVES/ufc_3_600_01_2016_c5.pdf. The weaker PVC pipes cracked under the pressure when hit by the cart — ultimately leading to the blast and release of tens of thousands of gallons of jet fuel.

29.     On Thanksgiving weekend, November 27-28, 2021, residents of military housing neighborhoods began to complain to the Navy and the DOH that their water wasn't right. They could smell fuel. They could see a sheen. The water reacted to flames.

30.     But by November 30, ten days after the blast, the Navy had still not advised anyone on their water line that there had been a fuel leak that affected their water source or warned they should not use or drink the water. The Navy held town halls to address the odor in the water but failed to disclose the blast or warn of the resulting contamination.

### C. The Safe Drinking Water Act and EPA regulations required the Navy to warn.

31.     The Safe Drinking Water Act and EPA regulations required the Navy to issue a Tier 1 public notice within 24 hours of confirming the Red Hill Shaft had

11

been contaminated with JP-5 fuel. The federal government has expressly waived sovereign immunity under the Safe Drinking Water Act as an operator of a public water system. 42 U.S.C. §§ 300f-300j (1996); SAFE DRINKING WATER ACT AMENDMENTS OF 1996, 1996 Enacted S. 1316, 104 Enacted S. 1316 ("The United States hereby expressly waives any immunity otherwise applicable to the United States with respect to any such substantive or procedural requirement").

32.    40 CFR §141.201 outlines "General public notification requirements:" "Each owner or operator of a public water system . . . *must* give notice for all violations of national primary drinking water regulations (NPDWR). . ." A Tier 1 public notice is required for NPDWR violations and situations with significant potential to have serious adverse effects on human health as a result of short-term exposure, including:

> "occurrence of a . . . waterborne emergency" (such as . . . a chemical spill or unexpected loading of possible pathogens into the source water that significantly increases the potential for drinking water contamination.

40 CFR §141.201

33.    The Navy was required to "[p]rovide a public notice as soon as practical but *no later than 24 hours* after the system learn[ed] of the violation." 40 CFR §141.202(b). The Navy was required to "provide the notice within 24 hours in a form and manner reasonably calculated to reach all persons served. The form and manner used by the public water system are to fit the specific situation, but must be

12

designed to reach residential, transient, and non-transient users of the water system." Minimum notice requirements are laid out in the regulation.

### D. After the blast, the Navy failed to warn residents of the danger.

34.    The Navy knew of a chemical spill that "significantly increase[d] the potential for drinking water contamination" on November 20, 2021. But the Navy failed to issue a Tier 1 notice to water system customers.

35.    Despite a legal obligation to do so noted by the EPA in their investigation report, the Navy failed to provide notification to water system customers in the required timeframe after "confirming the Red Hill Shaft had been contaminated with JP-5 fuel." *See* Redacted National Enforcement Investigation Center Civil Investigation Report, Joint Base Pearl Harbor-Hickam Public Water System, Environmental Protection Agency at 5, https://www.epa.gov/system/files/documents/2022-08/NEICVP1463E01%20Joint%20Base%20Pearl%20Harbor%20Hickam%20Public%20Water%20System_Redacted.pdf.

36.    On November 21, 2021, the Navy public affairs office issued a media release regarding the JP-5 fuel spill, stating that "personnel responded to what was initially assessed as a water leak shortly after 1700 (5:00 pm) on November 20, 2021. This pipe is not connected to the Red Hill Fuel tanks or main fuel pipelines, all of which are secure. Overnight, the release began to contain some amount of

13

fuel which increased into Sunday (November 21, 2021) morning. Approximately 14,000 gallons of a mix of water and fuel was contained in the lower tunnel . . . and has been recovered and transferred to an above-ground storage tank as of midday Sunday. The Navy made initial notification to the DOH Saturday night (November 20, 2021) and is providing updates Sunday. *There are no signs or indication of any releases to the environment and the drinking water remains safe to drink.*" *Id.* at 5 (emphasis added).

37.     On Saturday, November 27, 2021, at 1817 (6:17 p.m.), a JBPHH housing manager received the first customer complaint of a chemical smell in the water. By 0500 (5:00 a.m.) on November 28, 2021, JBPHH housing managers had received 42 customer complaints regarding water quality. *Id.* at 6.

38.     On the evening of Sunday, November 28, 2021, a water sample was collected that "smelled of fuel" and the Red Hill main pump #2 was secured, but the Navy did not notify water customers.

39.     On November 29, the Hawai`i DOH put out an advisory to "all Navy water system users avoid using the water for drinking, cooking, or oral hygiene." The advisory covered Aliamanu Military Reservation, Red Hill and Nimitz Elementary schools, and military housing. Officials said that all of the complaints received were from users of the Navy's water system. "As a regulated water system under the jurisdiction of the DOH's Safe Drinking Water Branch, the Navy

14

is responsible for maintaining a safe and reliable source of drinking water to its customers and to provide alternative sources of drinking water for human consumptive uses as deemed necessary," the advisory said.

40.     On November 29, by contrast, the Navy stated there was no "immediate indication" that the water was unsafe. Captain Erik Spitzer, USN, Commander of Joint Base Pearl Harbor-Hickam, told residents in military housing communities on November 29, "My staff and I are drinking the water on base this morning, and many of my team live in housing and drink and use the water as well."

41.     Ten days after the blast, on November 30, 2021, the Resident Services Office (RSO) sent an email to families stating that the Navy had not detected petroleum constitutes in the water. They asked that all JBPHH residents flush their water systems. And they stated that they were still investigating the "source" of the odor.

### E.  The Navy did not announce the leak until December 2, 2021−twelve days after the blast.

42.     On December 2, 2021, the Navy finally announced that it detected petroleum products in its Red Hill Shaft. Rear Admiral Blake Converse stated "We identified the petroleum products from two different tests. One test was taken on Sunday night shortly after this incident was identified to the Navy. And that test identified trace amounts of very volatile hydrocarbons, which would normally be

15

associated with something like a JP-5 or a diesel fuel," Converse said. The second test found "clear indications of petroleum products in the gas space just above the waterline in the Red Hill well," Converse said. "With both of those, we have pretty conclusive indications that there are volatile petroleum products in the well and we've determined that is the likely source of the contamination of our water distribution system."

43.     Follow on tests were no more encouraging. On December 10, test results from the DOH showed that hydrocarbons associated with diesel fuel were detected at 350 times the level the health department considers safe (the Environmental Action Level). A California lab found 140,000 parts per billion of total petroleum hydrocarbons as diesel or TPH-d. The DOH Environmental Action Level is 400 ppb. The water in the Red Hill shaft also showed gasoline hydrocarbons 66 times higher than the level considered safe. The lab found total petroleum hydrocarbons as gasoline at 20,000 ppb. The Environmental Action Level for TPH-g is 300 ppb.

**F.  The Navy itself accepted responsibility for the blast and failure to warn.**

44.     Later, the Navy took responsibility for the failures at Red Hill. In January 2022, Admiral Blake Converse said, "I want to start by saying that the Navy caused this problem, we own it, and we're gonna fix it." Later, Admiral Paparo reiterated:

16

The Navy is responsible for the 6 May 2021 and 20 November 2021 fuel spills at the Red Hill Bulk Fuel Storage Facility (Red Hill) and subsequent water contamination.

The Navy has a moral obligation and ethical duty to fix our mistakes, safeguard the environment, and rebuild trust. We must act.

*See* Cavanaugh Report.

### G. The Navy knew it was not safely operating the Red Hill fuel tank system.

45.    The Navy knew that it was not properly operating the Red Hill fuel tank system in a manner that would prevent a fuel leak.

46.    In an effort to mitigate the risk associated with inadvertent releases of fuel from the Red Hill facility, the Navy established an agreement with the State of Hawai`i in January 2008: "Red Hill Bulk Fuel Storage Facility Final Groundwater Protection Plan" (GPP). The GPP documented leaks from various tanks from the 1940s to the 1980s, totaling up to 200,000 gallons of dangerous fuel. The Plan stated:

In order to mitigate the risk associated with future releases, the U.S. Navy *will*: Implement a rigorous tank maintenance program, and Continue to research and investigate a viable leak detection system for the Facility. . .

Department of the Navy, Commander Naval Facilities Engineering Command, Pacific, *Red Hill Bulk Fuel Storage Facility Final Groundwater Protection Plan: Pearl Harbor Hawaii* (Jan. 2008),

17

https://health.hawaii.gov/ust/files/2014/08/2008-Final-Groundwater-Protection-Plan.pdf (emphasis added).

47.    The Navy's own audit confirmed that it was not complying with the requirements of the Groundwater Protection Plan. Between October 2008 and May 2010, the Navy conducted an audit of the Red Hill facility. In August 2010, the Navy completed its audit report and found "four areas of concern" that included: "groundwater contamination; tank inspection and maintenance requirements and schedule; detection of fuel releases; and completion [non-compliance] of response actions *required* by the GPP." Naval Audit Service, *Audit Report: Department of the Navy Red Hill and Upper Tank Farm Fuel Storage Facilities (Redacted)* at 9 (Aug. 16, 2010) (made available by the Board of Water Supply), https://www.boardofwatersupply.com/bws/media/redhill/audit-reports/red-hill-ocr-report-naval-audit-2010-08-16.pdf (emphasis added). "Based on the results of the audit work, we determined that the environment and groundwater sources in the Pearl Harbor area have not been sufficiently protected." *Id.* at 11.

48.    In January 2014, an improperly repaired fuel tank leaked up to 27,000 gallons of JP-8 jet fuel at the facility. Test results in soil vapor and groundwater in and around the tank indicated a spike in levels of hydrocarbons.

49.    In the wake of this error and in order to prevent additional fuel leaks, the Navy entered into an Administrative Order on Consent (AOC) with agencies

18

including the DOH and the EPA to take steps to ensure that the groundwater resource in the vicinity of the Facility is protected and the Facility is operated and maintained safely—an order that remains in effect to this day.

50.    The "Frequently Asked Questions" in the AOC indicated a full awareness of the threats facing the Red Hill facility:

> What is the likelihood of a future catastrophic release at the Facility?
> . . .
> The most likely catastrophic release scenario would be a piping failure with a release into the lower access tunnel. This vulnerability is being addressed by the Navy and DLA with the installation of oil tight doors in the tunnel system, along with a new fire suppression system to reduce the threat of a release caused by fire. Furthermore, the piping in the lower tunnel system is not buried or concealed and is visually inspected daily.

*Red Hill Bulk Fuel Storage Facility – Frequently Asked Questions*, Environmental Protection Agency, https://www.epa.gov/sites/default/files/2016-03/documents/red-hill-faq-2015-09-29.pdf.

51.    A risk assessment report prepared by defendant's own consultant in 2018 described the chances of future fuel releases at the Red Hill facility as:

- Greater than 27% probability of a sudden release of between 1,000 and 30,000 gallons of fuel each year.

- Greater than 34% chance of a sudden release of more than 120,000 gallons from the [Red Hill] in the next 100 years.

NAVFAC Pacific, *Quantitative Risk and Vulnerability Assessment Phase 1: Red*

19

*Hill Bulk Fuel Storage Facility, NAVSUP FLC Pearl Harbor, HI (PRL)*

(November 2021) at pp. 12-29, 14-1, https://www.epa.gov/sites/default/files/2019-06/documents/red_hill_risk_assessment_report_redacted-2018-11-12.pdf.

### H. The Navy's "flushing" and other cleanup efforts added insult to injury for affected families and compounded the toxic harm.

52.     As the extent of the crisis became undeniable, a series of senior U.S. Government officials apologized and promised to make things right. Captain Spitzer, who had previously told families the water was safe to drink, backtracked and apologized, "I regret I did not tell our families not to drink the water." On December 6, Secretary of the Navy Carlos Del Toro, on a previously scheduled visit to Hawai`i for the 80th Anniversary of the attack on Pearl Harbor, toured the facility. He publicly apologized for the crisis and said, "We are committed to rebuilding this trust. We're doing everything we can try to fix the problem." He also finally announced to the public that the Navy had temporarily suspended the use of the fuel tank facility nine days earlier on November 27 – days before they warned residents of any toxic danger to their water.

53.     On December 14, the Deputy Secretary of the Department of Defense, Dr. Kathleen Hicks, visited. "At DoD, we recognize the need to continue to care for all affected personnel and their families and help them return to their homes in a safe and expeditious manner," she said, "We also recognize we need to double down on our efforts to earn the trust and confidence of the people of Hawai`i in our

20

ability to manage this situation. . . I am committed to ensuring the health and well-being for our Service Members, their families, the people of Hawai`i, and the environment." Statement by Deputy Secretary of Defense Dr. Kathleen Hicks Following Her Visit to the Red Hill Bulk Storage Facility in Hawaii, (Dec. 14, 2021),

https://www.defense.gov/News/Releases/Release/Article/2873864/statement-by-deputy-secretary-of-defense-dr-kathleen-hicks-following-her-visit/.

54. In spite of the promises, the actual efforts to remediate the water situation only compounded the harm. The Navy's initial flushing program asked residents to run their water, and flush toilets and other devices to remove contaminants. Some residents reported that chemical fumes became overwhelming when they started flushing. The Agency for Toxic Substances and Disease Registry (ATSDR) makes clear that fuel fumes constitute additional exposure to the chemicals – as does the military's occupational risk protocol for exposure to benzene. Families will testify that the flushing exacerbated their symptoms. In addition, many of the government personnel flushing these homes did so negligently, leaving water damage and more toxicity behind—causing further harm. Air tests of affected homes show that the aerosolized jet fuels were measurable weeks later. Most flushing teams emptied water heaters directly into the yards—adding the toxins to the soil, which would then infiltrate the ground

21

water and further contaminate the environment.

55.     The Navy also opened water hydrants to run into residential streets, yards, and storm drains that run into the ocean – in violation of law. The Clean Water Act (CWA) regulates the discharge of pollutants and defines "discharge of pollutants" as "any discernable, confined and discrete conveyance from any point source." 33 U.S.C. § 1362(12). The Act aims to prevent, reduce, and eliminate pollution in the nation's water in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish this goal, Section 301(a) prohibits the discharge of any pollutant into waters of the United States that are not authorized by a National Pollutant Discharge Elimination System (NPDES) permit issued pursuant to section 402(b). 33 U.S.C. §§ 1311, 1342(b).

56.     Section 301(a) of the CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger is in compliance with the terms of an NPDES permit. 33 U.S.C. § 1311(a). The Navy is a "person" as defined in the CWA and has waived its sovereign immunity under the Act. *See* 42 U.S.C. § 6903(15); 33 U.S.C. § 1365(a)(1).

57.     On November 29, 2021, residents of the military housing communities captured video of Navy personnel illegally flushing contaminated water directly into residential streets and storm drains. The DOH confirmed that

22

such flushing of tainted water occurred in violation of the CWA and Hawai`i Revised Statutes Chapter 342D-50, which prohibits the discharge of pollutants to state waters without a permit issued by the Director of Health. The brazen violation of environmental laws constitutes negligence. The DOH issued a cease-and-desist order to the Navy to stop the illegal flushing.

58.    Furthermore, the Child Development Centers run by the military to provide childcare on base continued to have children use dangerous and contaminated water long after the contamination began. Despite repeated attempts to have the centers verify that children's porous plastic drink cups had been replaced, the Child Development Center was unable to confirm the replacement of all contaminated items known to pose a risk of exposure.

59.    The Navy's response only compounded the harm to affected families. On December 2, the U.S. Army authorized evacuation and lodging expenses for affected families. The Navy did not do so until a day later, almost a week after water complaints began to flood in. The Navy estimates approximately 3,200 families were displaced from military housing to live temporarily in hotels. Families of four remained in single hotel rooms, where they lived for months.

60.    On February 14, 2022, water in one portion of the Red Hill housing complex was cleared as safe to drink by the DOH. This clearance was based on testing only 10% of the affected homes despite repeated requests from families to

23

test all the homes.

61. The Navy's flushing efforts did not include replacement of plastics or water heaters. Nor did the flushing effort include scrubbing the air of the air contaminants—a common practice in remediation.

62. Once the government cleared neighborhoods as "safe," families were forced to move back into the homes that made them sick. Many families, including each of the plaintiff families, got sick immediately upon moving back into the homes. Residents reported that sediment from the fuel remained in the bottom of the water heaters, and they continued to get burned during showers and experience other symptoms. Many families continued to avoid use of the water.

## I. Federal officers failed to provide appropriate medical care to families affected, compounding injuries that the Navy had caused.

63. After May 2021, active-duty military families, covered by the TRICARE health care program, reported to military health care facilities with symptoms of toxic exposure. They suffered from stomach cramps, vomiting, diarrhea, and rashes. Some asked about polyps and lesions they had noticed. Many reported slower thinking (brain fog), and that their children, previously well behaved and advanced for their age, had begun to behave erratically, regress in developmental milestones, recede into themselves, or become confused.

64. The standard of care for exposure to jet fuel or other drinking contaminants requires a neuropsychological assessment and baseline labs,

24

including a comprehensive chemistry panel to test renal function, liver function, electrolytes, and complete blood count (CBC). Patients should also likely receive an X-Ray or EKG.

65.    In fact, the United States Government recognizes the risk of benzene exposure in its' own policies and procedures – and has a clear testing approach to addressing such risk. In DoD 6055.05-M, military personnel who have occupational exposure to benzene get an initial and annual exam. They are "required" to get a "complete blood count" with "results reviewed by an examining physician." If they have faced "emergency exposure," they are to receive an "end of shift urinary phenol test." The Department of Defense Occupational Health Surveillance Manual, DODD 6055.05-M (4 May 1998 as amended in 2018).

66.    These standards were not met. When the plaintiff families presented to emergency rooms or "exposure tents" that were set up by the Army and Navy, most were denied any tests or labs. Families have even been told that testing is "impossible" and that the toxicologist at Walter Reade advised against ordering labs or other tests for fear of the implications of the care that would be required thereafter.

67.    Not only did military providers fail to meet the standard of care upon initial exposure, their providers failed to follow the appropriate protocols to treat the plaintiff families thereafter. Their care has been rife with medical delay, failure

25

to treat, and failure to diagnose.

68.     For example, military providers have failed to screen for the illnesses that the United States itself has documented as related to exposure to water contaminated with jet fuel. Military providers repeatedly told patients that there is simply "no research" on the issue—notwithstanding the volumes of government research on similar circumstances at Camp LeJeune.

**J.   The Navy's operations at Red Hill likely violated additional regulations.**

69.     Upon information and belief, Navy officers violated additional regulations and mandatory requirements at Red Hill. Investigations are ongoing.

70.     Congress foresaw the public health harm posed by hazardous substances such as jet fuel and passed key legislation to prevent toxic exposure. In the 1970s, Congress passed the CWA and the Safe Drinking Water Act (SDWA), 42 U.S.C. §300f et seq, requiring the EPA to establish regulations ensuring clean and safe drinking water for the public. The legislation and implementing regulations are intended to prohibit the discharge of "oil and hazardous substances" into the environment because of the serious and severe threat to public health posed by these substances. *See, e.g.,* 33 U.S.C. § 1321.

71.     The SDWA was established to protect the quality of drinking water in the U.S. This law focuses on all waters actually or potentially designed for drinking use, whether from above ground or underground sources. The Act

26

authorizes the EPA to establish minimum standards to protect tap water and requires all owners or operators of public water systems to comply with these primary (health-related) standards.

72.     National Primary Drinking Water Regulations (NPDWRs or primary standards) are legally enforceable standards that apply to public water systems. Primary standards protect public health by limiting the levels of contaminants in drinking water. The EPA provides a table listing the Maximum Contaminant Level (MCL) for various chemicals, the highest level of a contaminant that is allowed in drinking water. MCLs are enforceable standards. The MCL sets enforceable limits for benzene (.005 milligrams per liter), toluene (1 milligram per liter), ethylbenzene (0.7 milligrams per liter), xylene (10 milligrams per liter), and other light petroleum distillates.

73.     The State of Hawai`i has adopted a State Water Code, codified in Chapter 174C of the Hawai`i Revised Statutes, which states in relevant part:

> **Declaration of policy.** (a) It is recognized that the waters of the State are held for the benefit of the citizens of the State.  It is declared that the people of the State are beneficiaries and have a right to have the waters protected for their use.

Haw. Rev. Stat. 174C-2.

74.     Hawai`i law also regulates potable water. The Hawai`i Department of Health Rules Relating to Hawai`i Potable Water Systems (Hawai`i Administrative Rules [HAR] Title 11, Chapter 20) set forth Maximum Contaminant Levels of

27

certain chemicals in public and private drinking water systems. These MCLs are analogous to the National Primary Drinking Water regulations but additional substances are regulated.

75.    Federal and State programs for the management of underground storage tanks such as Red Hill were first published in the 1980s. In January 2000, the State of Hawai`i promulgated rules requiring owners and operators of such facilities to report suspected or confirmed releases from USTs.

76.    All of these regulations provide mandatory requirements for federal agencies and federal officers, and the extent of the Navy's violations at Red Hill will be subject to discovery.

### K. Affected families have suffered extraordinary harm and fear.

77.    The Navy's jet fuel leaks—and conduct thereafter—have resulted in extraordinary inconvenience, illness, fear, and trauma for each of the affected families:

### a. The Feindt Family[3]

78.    The Feindts, Patrick, Amanda (Major, U.S. Army),[4] and their children

---

[3] A more expansive explanation of the damages suffered by the Feindt family is available in the attachment to their SF-95 form.

[4] As an active-duty soldier, Major Amanda Feindt's legal ability to pursue tort claims against the United States is limited under the doctrine enunciated in *Feres v. United States*, 340 U.S. 135 (1950). Major Feindt is still evaluating her potential

28

P.G.F. and P.R.F., lived in the Ford Island neighborhood of Honolulu, Hawai`i.

The Feindt family moved from their off-base home in Ewa Beach to Ford Island

military housing on Joint Base Pearl Harbor-Hickam at the end of April 2021.

79.    In late November and early December, as her family struggled with an

onset of debilitating symptoms such as nausea, vomiting, dehydration, diarrhea,

migraines, lethargy, and neurological changes, Major Feindt got several notices in

her email from government officials about the jet fuel spill that told her the "water

was safe to drink." The Feindts also received notification that their children were

being provided clean water at their on-base child development center since 29 Nov

2021, but the Navy did not supply clean water to the child development center until

December 10, 2021. Despite the family's exposure through their home and her

children's secondary exposure endured at the Child Development Center on the

same water line, Major Feindt and her husband's pleas for testing and information

went repeatedly unanswered by government officials.

80.    Patrick and their two children were denied basic testing when they

presented at Tripler Medical Center with acute reactions to the contamination.

---

claims in light of the recent exception to *Feres* passed in the National Defense
Authorization Act of 2020 permitting administrative claims against the United
States for personal injury or death of a member of the uniformed services that was
the result of medical malpractice caused by a Department of Defense health care
provider. Although this Complaint covers her family, Major Feindt does not waive
any of her potential claims.

29

Tellingly, Major Feindt was given a battery of tests as a military officer (consistent with the appropriate standard of care) that were denied to her own family. Their children's lives have been turned upside down as multiple doctors have tried to explain and treat their symptoms.

81.     Initially moved into a hotel for months, the Feindts were finally transferred off of the island after immense effort and financial and professional sacrifice. Although the Feindts have moved to Colorado, the health problems caused by the water contamination have come with them.

82.     Patrick (a PGA Golf Professional) has had five medical procedures and internal bleeding as the doctors struggled to find the cause of illness. He continues to experience debilitating abdominal and flank pain that radiates down to his testicle which required exploratory surgery, during which three small hernias, stomach ulcers, large and small intestine damage was noted. He was given a capsule camera, endoscopy, a colonoscopy, and the surgeons took several biopsies. He was also given a double balloon procedure to view his intestines. The gastroenterologists have ruled out most suspected gastrointestinal issues and they are now turning to neurology to find a possible source of his pain. He will need a brain scan in the coming weeks. Mr. Feindt had to resign from his Director position in HI and file for unemployment, leaving Major Feindt as the sole provider for the family.

30

83.   Both children have experienced sustained symptoms including diagnosed regressive and hyperactive behavioral changes, P.G.F. is currently seeing a pediatric specialist, psychiatrist, psychologist, hematologist, immunologist, dermatologist, speech and occupational therapist(s), and neurologist and was placed on new medication for the behavioral issues. P.R.F. has been seeing a pediatric specialist, pulmonologist, dermatologist, and was denied hematology which the family is currently fighting.

84.   Patrick Feindt and his entire family have suffered from the reasonable fear and lasting trauma of the government's water contamination and lack of transparency. To this day they have no idea the full extent of the exposure of their children at their home or the Child Development Center because the government has refused to provide requested information. They look to the families affected by Camp LeJeune and reasonably fear for their medical futures.

85.   The Feindt family is at risk of future medical conditions associated with the components present in their contaminated drinking water.

**b.  The Freeman Family[5]**

86.   The Freeman family, Nastasia, her husband (an active-duty Navy

---

[5] A more expansive explanation of the damages suffered by the Freeman family is available in the attachment to their SF-95 form.

31

Ensign),[6] and their children, K.F., D.F., and N.F., lived in the Aliamanu Military Reservation neighborhood of Honolulu, Hawai`i.

87.    Nastasia Freeman's family has been plagued with abdominal pain, vomiting, memory loss, skin rashes, brain fog, eye irritation, seizures, and teeth and gum issues because of the fuel leaks caused by the Navy. A dormant, preexisting seizure disorder flared up for Nastasia[7] in the wake of the Navy's jet fuel negligence and she began suffering from multiple seizures a day, ending any chance of continuing her life as usual.

88.    While doctors attribute these maladies to their water, the military has failed to provide the most basic levels of healthcare for the Freeman family.

---

[6] As an active-duty sailor, Ensign Freeman's legal ability to pursue tort claims against the United States is limited under the doctrine enunciated in *Feres v. United States*, 340 U.S. 135 (1950). Ensign Freeman is still evaluating his potential claims in light of the recent exception to *Feres* passed in the National Defense Authorization Act of 2020 permitting administrative claims against the United States for personal injury or death of a member of the uniformed services that was the result of medical malpractice caused by a Department of Defense health care provider. Although this Complaint covers his family, Ensign Freeman does not waive any of his potential claims.

[7] Under Hawai`i law, the Navy is responsible for any predisposition to injury or preexisting injury (known or unknown) that were exacerbated by its negligence. Indeed, the Hawai`i Supreme Court has made clear that a tortfeasor is responsible "for all injuries legally caused by the defendant's negligence. However, it is well settled that a tortfeasor is liable not only for damages resulting from direct and unique injuries inflicted on the victim, but also for damages resulting from the aggravation of the victim's pre-existing disease, condition, or predisposition to injury." *Montalvo v. Lopez*, 77 Hawai`i 282, 294, 884 P.2d 345, 357 (Haw. 1994).

32

Military providers refused to order basic blood screening panels to check their liver and kidney function after toxic exposure. It was not until Nastasia ended up in the emergency room at the Mayo Clinic—off the island—that she was finally given the tests that she had needed all along. Her provider there was surprised by the lack of care she had received on base.

89.    The Freemans were initially moved into a hotel but sought, through multiple requests, to get off of the island. At great expense and difficulty, they have moved to the mainland in February, but their harm has continued. The Freeman's purchased a $850,000 home so that they had a permanent address and could receive medical care in California. A CT scan in April showed calcifications on Nastasia's bladder wall and the urologist found blood still present in her urine, prompting pending cancer screening on her bladder. She was referred to pelvic and genetic therapy, and the doctors did a screening for a family history of cancer. MRIs revealed multiple lesions on her brain and there is abnormal peripheral displacement of the pituitary gland which is causing the area to fill with spinal fluid. After multiple setbacks, she was admitted to Walter Reed to monitor brain activity and run more medical tests. Walter Reed questioned her increase dosage of seizure medication and was told that it was not controlling her symptoms. She was taken off the medication and some of her symptoms got better and she had more energy, but she knows she will have to be put on a different medication soon.

While at Walter Reed she learned she was also suffering from vestibular dysfunction. The doctors questioned why her medication was raised from 500 mg to 3000 mg on her seizure medication while in Hawai`i. She will be treated by her ENT doctor for the vestibular issues. A nephrologist is monitoring her kidneys. She was assured by Walter Reed that a team was available to continue her care back in San Diego, but so far, they have not been able to replicate the treatment plan.

90.    Financially, Nastasia's work as a therapist has ground to a halt with her family's medical challenges. The cost of the move, the house, the medical procedures has left her family in dire financial straits.

91.    The Freeman children continue to suffer from the exposure. Their son, D.F., underwent evaluation for developmental delays and autism markers and was diagnosed with autism level 2. He is still experiencing symptoms and was hospitalized in April after going limp and losing consciousness. K.F. and N.F. are also still stick. Both K.F. and N.F. had abnormal lab results in August, which noted concerning areas in the liver, kidney, and pancreas. K.F. also had blood in his urine. N.F. woke up and was in so much pain that he was vomiting and could not move in mid-August. He was taken to the hospital on August 18 and 21, 2022, unable to support himself and with a fever.

92.    Nastasia Freeman's medical care has been riddled with mistake,

34

delay, failure to diagnose, and failure to treat. These medical failures have resulted in life-threatening injury—all while relocating and taking care of the rest of their sick family. Nastasia is beside herself. "I did nothing wrong; my kids did nothing wrong. However, the treatment, the retaliation, the negligence, the lack of decency to communicate between commands, and the responsibility and failure to provide medical screenings put my life at risk."

93.     The Freeman family is at risk of future medical conditions associated with the components present in their contaminated drinking water.

### c.  The Simic Family[8]

94.     The Simics, Jamie, her husband, a Senior Chief Petty Officer[9] in the United States Navy, and their children, M.S., and J.S., lived in the Hale Na Koa neighborhood of Honolulu, Hawai`i.

95.     Once an active and attentive mother of two, Jamie found her life

---

[8] A more expansive explanation of the damages suffered by the Simic family is available in the attachment to their SF-95 form.

[9] As a then active-duty sailor, Senior Chief Petty Officer Simic's legal ability to pursue tort claims against the United States is limited under the doctrine enunciated in *Feres v. United States*, 340 U.S. 135 (1950). He is still evaluating his potential claims in light of the recent exception to *Feres* passed in the National Defense Authorization Act of 2020 permitting administrative claims against the United States for personal injury or death of a member of the uniformed services that was the result of medical malpractice caused by a Department of Defense health care provider. Although this Complaint covers his family, Senior Chief Petty Officer Simic does not waive any of his potential claims.

35

forever changed by the water contamination at Red Hill. Jamie has a condition called Ehlers-Danlos Syndrome. This condition often intensifies her symptoms from contaminated water. As mentioned above, Hawai`i law makes clear that the tortfeasor is responsible for their victims as they find them, including preexisting conditions.

96.    From July 2021 to November 2021, Ms. Simic was in the emergency room five times. Her doctors discovered a benign cyst on her kidney, a cyst on her breast, teratoma tumor on her ovary, and three legions that were removed from her colon and esophagus bone from September to December. She has undergone two colonoscopies, two endoscopies, a barium swallow study, multiple blood draws that revealed elevated levels of lipase, blood in her urine, heart monitoring, excessive menstrual bleeding, severe leg pain and swelling that makes it difficult to walk, leg paralysis, and swelling/itching under her arms. After dropping below 98 pounds, she began telling her children things they should know if she passed away.

97.    Jamie was again admitted to the emergency room on December 6, 2021, for exposure to hydrocarbons. "The ER doctor only admitted me because my colon was swollen, and I was throwing up and severely ill. He tried to send me home saying there was no way I was this sick because the leak was only two days, max two weeks." Jamie remained in the hospital for four nights. During that time, she was not given the standard care for an exposure of this kind: EKG,

36

neuropsychological assessment, kidney and liver panels, and CBC panels.

98.    Since falling ill, Ms. Simic's doctors have found multiple cysts, legions, and tumors throughout her body. Her two children have similarly suffered from neurological challenges, respiratory symptoms, and lesions.

99.    While the Simics were finally diagnosed with their exposure, they have not received the basic level of medical care. Eight-year-old J.S. and nine-year-old M.S. suffered from the same symptoms as Jamie. Bouts of diarrhea, stomach aches, and vomiting would send the kids home from school. Both children suffered from infections on their face, and J.S. lost five teeth since December 4 – four requiring surgical removal. Their parents noticed a change in their behavior as the kid's displayed aggression and became lethargic around the home. They are still suffering from bloody stool and diarrhea, headaches, leg and kidney pain, shortness of breath, heart palpitations, vomiting and lesions.

100.    Jamie and her family have been in and out of the hospital multiple times since leaving the island in March. She has been to the emergency room over five times and hospitalized twice. She has had a colonoscopy, endoscopy, and several biopsies which revealed issues with her stomach lining.

101.    Financially, the Red Hill leak has devastated the Simics, who threw out prized family possessions in their effort to leave the island and the contamination. They are considering selling their home to move where the family

37

can get better treatment and say that this has wrecked them financially.

102.   Psychologically, Jamie and her family remain riddled with fear about what happened with the water, exacerbated by the government's lack of transparency. She has debilitating concerns about the contaminates and their lasting effects on her and her family. "We don't even know what all was in the water. I just want answers."

103.   The Simic family is at risk of future medical conditions associated with the components present in their contaminated drinking water.

### d.  The Wyatt Family[10]

104.   The Wyatts, Ariana, her husband, an active-duty Technical Sergeant in the Air Force[11], and their daughter, I.W., lived in military housing in Earhart Village, Honolulu, Hawai`i.

---

[10] A more expansive explanation of the damages suffered by the Wyatt family is available in the attachment to their SF-95 form.

[11] As an active-duty airman, Technical Sergeant Wyatt's legal ability to pursue tort claims against the United States is limited under the doctrine enunciated in *Feres v. United States*, 340 U.S. 135 (1950). He is still evaluating his potential claims in light of the recent exception to *Feres* passed in the National Defense Authorization Act of 2020 permitting administrative claims against the United States for personal injury or death of a member of the uniformed services that was the result of medical malpractice caused by a Department of Defense health care provider. Although this Complaint covers his family, Technical Sergeant Wyatt does not waive any of his potential claims.

105. The Wyatts, a previously healthy family, sustained severe injury in the wake of the Navy's fuel leaks. Ariana experienced migraines with visual auras, diarrhea, swelling in her right kidney that sent her to the emergency room, rashes that covered her face, abdominal pain, and a laparoscopic surgery where her doctor discovered endometriosis on her ovaries.

106. Their daughter, I.W., began suffering from abdominal pain, nausea, vomiting, diarrhea, headaches, irritation of the skin and eyes, mouth sores, heart palpitations, bladder incontinence, and substantial hair loss, all before the age of four.

107. Despite these maladies, emblematic of fuel contamination, the family received subpar medical care from the government. Ariana requested lab work – specifically toxicology and blood panels to be done for her and I.W. She was told that this testing was not necessary. Their requests for labs were denied.

108. Their symptoms persisted. Ariana is seeing a neurologist for constant migraines. She had blood in her stool and spends most nights sleeping in an upright position to ease the pain. The brain fog persisted, especially while inside her home. Sometimes it was so bad, Ariana would slur her words. She still experiences nausea and a burning feeling in her stomach. The rash on her face and scalp did not go away while in Hawai`i, despite the numerous medications from the dermatologist.

39

109.   In the immediate aftermath of the November spill, the Wyatt family moved into seven different hotels After multiple unsuccessful requests for a compassionate reassignment off of the island, the family was finally approved only after media attention on their story.

110.   The Wyatts have moved to Alabama, but their health issues have persisted. I.W. has experienced behavioral changes and sustained, neurological issues. She had repeat blood work done at their new location, and her TSH and antibodies were elevated. She is maxed out on medications. I.W. also began having fevers that reached 104 degrees every few weeks that lasted several days. The doctors have tested her for all the normal illnesses, but do not have any answers. I.W. spent the night in the hospital recently, and her doctors have said when this happens, she should continue to be taken to the emergency room for monitoring.

111.   I.W. now suffers from hypothyroidism and hair loss from her medications. "It's because I drank the bad water," she will tell people. Ariana's heart breaks for her daughter as she is subjected to blood draws every three weeks that are so traumatic her parents must hold her down as I.W. screams and pleads for them to stop. "It makes me sick, it's been so traumatizing for [I.W.]," Ariana explained. The Navy's negligence has left lasting injuries on the Wyatt family, financial, physical, and psychological.

112.   The Wyatt family is at risk of future medical conditions associated

40

with the components present in their contaminated drinking water.

## CAUSES OF ACTION

### COUNT 1: NEGLIGENCE

113.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

114.   The United States owns and operates the Red Hill Bulk Fuel Storage Facility.

115.   The United States had a duty to exercise reasonable care in the operation and maintenance of the Red Hill Bulk Fuel Storage Facility.

116.   Federal officers breached the duty to exercise ordinary care at Red Hill in at least the following respects:

   a.   Officers failed to adhere to the proper valve sequencing in May 2021;

   b.   Officers failed to implement mandatory corrective actions after the May 2021 leak and prior leaks;

   c.   Officers violated mandatory provisions of the Safe Drinking Water Act;

   d.   Officers failed to install or replace pipes with mandatory steel piping;

   e.   Officers operated the train cart on November 20, 2021, negligently and at excessive speed;

   f.   Officers knew or should have known of the fuel buildup in the PVC

41

piping between May and November 2021 and failed to take corrective action;

g. Officers failed to warn residents that the leaks had occurred in violation of federal and state law;

h. Officers ordered junior servicemembers to flush hazardous fuel into groundwater without a permit and in violation of federal and state law;

i. Officers knew that maintenance failures had compromised Red Hill and failed to take corrective action to prevent harm; and

j. Various other safety violations and breaches to be determined upon discovery.

117. As a direct and proximate result of defendant's breach of duty of care, the plaintiffs have been injured.

118. As a direct and proximate result of the negligence of defendant and its officials, the plaintiffs suffered substantial injuries and damages, including severe mental and emotional distress.

119. As a direct and proximate result of the negligence of defendant and its officials, the plaintiffs suffered special damages and will require testing/medical monitoring to be determined by expert testimony.

120. Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate the plaintiffs for the

negligence of the United States.

COUNT II: NUISANCE

121.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

122.   Plaintiffs are, or during some or all of the pertinent times were, in lawful possession of their properties on the Red Hill Navy water line, and used them, or had the right to use them, as residences or for other legitimate uses.

123.   The United States owned and materially controlled the Red Hill Bulk Fuel Storage Facility in close proximity to the plaintiffs' properties and the water well that provided water to the plaintiffs' properties.

124.   The United States is liable for the creating a condition at the plaintiffs' residences that interfered with their right to use and enjoy those properties. The officers' conduct in operating the Red Hill Bulk Fuel Storage Facility thereby caused a nuisance to the plaintiffs.

125.   The plaintiffs' right to use and enjoy their properties has been impaired by the United States allowing fuel to leak from the Red Hill Bulk Fuel Storage Facility into its water well, contaminating the water delivered to the plaintiffs' properties.

126.   The nuisance caused by the United States has substantially impaired the plaintiffs' use and enjoyment of their property, has caused inconvenience,

43

decreased quality of life, physical and mental discomfort, reasonable fear of disease, and adverse health effects.

127.   The United States has engaged in improper or negligent operation of the Red Hill Bulk Fuel Storage Facility, causing harm to the plaintiffs.

128.   Defendant's conduct has been unreasonable. Reasonable persons, generally, looking at defendant's conduct, the problems caused by it, and by the nature of the harm to the plaintiffs' properties and health, would consider defendant's conduct to be unreasonable.

129.   The invasions, harms, and injuries complained of herein by the plaintiffs are substantial invasions, harms, and injuries to the plaintiffs' health, both physical and mental.

130.   The United States had full knowledge during some or all of the pertinent times when the Red Hill Bulk Fuel Storage Facility leaked fuel into the water supply and caused nuisance injury and harm to the plaintiffs.

131.    The United States knew or should have known that leaking fuel into the water supply would invade the plaintiffs' properties and substantially impair the plaintiffs' health and use and enjoyment of their properties.

132.   While knowing that practicable technologies and methods are available to abate fuel leaks, defendant has failed to abate the causes of nuisance.

133.   Defendant's conduct described above constitutes a series of recurring

44

abatable nuisance, which defendant has failed to remedy within a reasonable period of time, and for which defendant is liable.

134.   As a result of defendant's liability for recurring abatable nuisance, the plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

COUNT III: MEDICAL NEGLIGENCE, FAILURE TO TREAT, DELAYED CARE

135.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

136.   The United States has negligently failed to treat the plaintiffs' medical conditions caused by the Red Hill Bulk Fuel Storage Facility fuel leaks.

137.   The United States has failed to monitor the plaintiffs' conditions, perform required medical tests, or treat the illnesses caused by the negligent conduct relating to the Red Hill Bulk Fuel Storage Facility fuel leaks.

138.   The United States has failed to adhere to the accepted standards of care for the plaintiffs.

139.   The United States has failed to timely address the health conditions of each of the plaintiffs or perform the standard of care in a timely manner, including appropriate referrals.

140.   In some instances, the United States has failed to treat the plaintiffs altogether, refusing appropriate tests or treatment.

45

141.   The United States failed to clearly communicate the important facts regarding the Red Hill Bulk Fuel Storage Facility fuel leaks to the plaintiffs or their medical care providers, allowing them to become ill, with no transparency in communicating the origin of the harm.

142.   Defendant's conduct described above constitutes a medical failure to treat or delay to treat medical conditions of the plaintiffs, for which the United States is liable.

143.   As a result of defendant's liability for recurring abatable medical negligence and failure to treat, the plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

COUNT IV: INFLICTION OF EMOTIONAL DISTRESS

144.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

145.   By its acts and omissions, the United States caused fuel to leak into the water system and injure residents, which thereby caused the plaintiffs worry, anxiety, anguish, suffering, and grief.

146.   The United States knew that the Red Hill facility has a history of fuel leak water contamination, and that it was probable that additional leaks would occur and cause substantial damage if it did not act.

147.   The United States must now pay for the exact consequences that it

46

knew would happen and for which it accepted the risk.

148.   Plaintiffs, as well as their children, spouses, and other occupants of their homes, have suffered, are suffering, and will continue to suffer because of the defendant's acts and omissions.

149.   Defendant's conduct was a substantial factor in causing the plaintiffs' severe emotional distress.

150.   Plaintiffs have been damaged in an amount to be proven at the time of trial.

### CAUSATION

151.   But for the conduct of the federal officers at Red Hill, the plaintiff families would not have suffered inconvenience, illness, fear, and trauma.

152.   As a general matter, the ingestion of jet fuel and its contaminants causes medical harm. Fuel is composed of toxic hydrocarbons that are highly dangerous to the human body. The Agency for Toxic Substances and Disease Registry (ATSDR) of the United States Department of Health and Human Services describes the long-lasting health effects of exposure to fuel chemicals. Such exposure can occur by breathing air in an area where an accident or leak of these jet fuels has occurred, touching contaminated soil, swimming in waters where jet fuels have been spilled, living near a hazardous waste site where jet fuels are disposed or, most directly, drinking such fuel.

153.   In the near-term, symptoms of such exposure regularly include headaches, fatigue, nausea, drowsiness, irritation of the throat and stomach, difficulty breathing, fever, and vomiting. In the long term, permanent damage to the central nervous system can result, as well as pneumonia, cancer, decreased immune response, decreased neurological function, impaired hearing, and skin alteration. Drinking too much jet fuel can lead to unconsciousness and death. Affected organ systems include the respiratory tract, gastrointestinal tract, nervous system, liver, kidneys, reproductive system, and harm to a developing fetus – miscarriages have been reported. Benzene, just one of the chemicals the EPA identified as present in the Red Hill fuel, causes chronic conditions such as aplastic anemia, leukemia, and potentially multiple myeloma.[12]

---

[12] Benzene featured prominently as a substance present in another military water contamination case: the Camp Lejeune water contamination crisis. From the 1950s through the 1980s, people living or working at the U.S. Marine Corps Base Camp Lejeune, North Carolina, were exposed to drinking water contaminated with industrial solvents, including benzene. For those exposed to that contaminated water, the Department of Veterans Affairs now considers the following health conditions to be presumptively connected to their service:
- Adult leukemia
- Aplastic anemia and other myelodysplastic syndromes
- Bladder cancer
- Kidney cancer
- Liver cancer
- Multiple myeloma
- Non-Hodgkin's lymphoma
- Parkinson's disease

48

154.   Specifically, each Plaintiff has suffered inconvenience and life disruption, illness, and fear and trauma.

155.   Each plaintiff is also at future risk of medical harm and will need medical monitoring for the associated long-term illnesses.

NO EXCEPTIONS APPLY

156.   None of the plaintiffs' claims asserted herein are subject to any of the exceptions to sovereign immunity found in 28 U.S.C § 2680.

157.   None of the negligent acts described herein were discretionary or subject to policy analysis.

158.   None of the acts or omissions described herein are protected by the misrepresentation exception. The plaintiffs do not assert misrepresentation but rather failure to warn of known risk.

159.   The United States, including the US Navy and its employees, failed to meet the required reporting obligations as described herein.

160.   The United States, including the US Navy and its employees, failed to exercise due care in the execution of its duties under the required report obligations described herein.

## JURISDICTION, VENUE & SERVICE

161.    This Federal District Court has federal-question jurisdiction because this action is brought pursuant to and in compliance with the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*

162.    Venue is proper in this district pursuant to 28 U.S.C. § 1402(b) because the United States is a defendant, and this is the judicial district where the acts or omissions complained of in this complaint occurred.

163.    The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure. Service is affected by serving a copy of the Summons and Complaint on the United States Attorney for the District of Hawai`i by certified mail, return receipt requested at her office:

> United States Attorney's Office
> ATTN: Civil Process Clerk
> 300 Ala Moana Blvd # 6-100
> Honolulu, HI 96850

164.    Service is also affected by serving a copy of the Summons and Complaint on Merrick Garland, Attorney General of the United States, by certified mail, return receipt requested at:

> The Attorney General's Office
> ATTN: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

50

## LIABILITY OF THE UNITED STATES

165.   This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages of which the Complaint is made were proximately caused by the negligence, wrongful acts or omissions of representatives, employees, or agents of the United States of America working for the United States Department of the Navy, Army, or Defense, while acting within the scope of their office, employment, or agency under circumstances where the United States of America, if a private person, would be liable to the plaintiffs in the same manner and to the same extent as a private individual.

166.   Through the Federal Torts Claim Act, the United States has waived its sovereign immunity for the acts and omissions described here. *E.g.*, *Evans v. United States*, 876 F.3d 375, 380 (1st Cir. 2017), *cert. denied*, 139 S. Ct. 81 (2018).

167.   The defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated the Red Hill Bulk Fuel Facility and staffed its facilities and vehicles with its agents, servants, and employees.

## CONDITIONS PRECEDENT

168.   Pursuant to 28 U.S.C. § 2675(a), the plaintiffs timely presented their claims to the United States by submitting Forms SF-95 to the Vice Admiral Darse E. Crandall, Office of the Judge Advocate Office, General Tort Claims Unit Norfolk, 9620 Maryland Avenue, Suite 205, Norfolk, Virginia 23511-2949, via USPS Priority Mail Express, on February 22, 2022. *See* Forms SF-95 and cover letters, attached as Ex. A.

169.    Receipt of the claims (Patrick Feindt, Jr., Navy File No. 1220411; P.R.F, Navy File No. 1220412; P.G.F, Navy File No. 1220413; Nastasia Freeman, Navy File No. 1220393; K.F., Navy File No. 1220394; D.F., Navy File No. 1220395; N.F., Navy File No. 1220396; Jamie Simic, Navy File No. 1220404; M.S., Navy File No. 1220405; J.S., Navy File No. 1220406; Ariana Wyatt, Navy File No. 1220397; and I.W., Navy File No. 1220398 ) by the Department of the Navy on February 23, 2022 was acknowledged by Ms. Andrea R. Ladner and Ms. Amanda Cook, Tort Claims Assistants, Tort Claims Unit Norfolk, Office of the Judge Advocate General, Department of the Navy.

170.   As of August 23, 2022, more than six (6) months have elapsed since the claims were presented to defendant and defendant has not made a final disposition of the plaintiffs' claims. Accordingly, the claims of the plaintiffs are deemed denied pursuant to 28 U.S.C. § 2675(a).

171.   Plaintiffs have exhausted their administrative remedies under the Federal Tort Claims Act and have fully complied with the statutory prerequisites for bringing this tort action against the United States.

## DAMAGES

172.   As a result of the negligence of federal employees, agents, or representatives, the plaintiffs have sustained damages and injuries including:

a.  Past and future physical pain and suffering;

b.  Past and future mental anguish;

c.  Past and future medical, healthcare, and attendant care expenses;

d.  Past and future lost income and of earning capacity;

e.  Past and future physical impairment;

f.  Past and future loss of enjoyment and quality of life;

g.  Past and future loss of enjoyment of property;

h.  Nuisance damages, including inconvenience, illness, and fear;

i.  Out of pocket expenses;

j.  Loss of personal property;

k.  Costs;

l.  Prejudgment and post-judgment interest as provided by law, at the maximum legal rate; and

m. Such other and further relief to which the plaintiffs may be justly

53

entitled.

## PRAYER

WHEREFORE, Plaintiffs pray that this Court:

a. Award the plaintiffs compensatory damages, in an amount to be determined at trial;

b. Award the plaintiffs pre-judgment and post-judgment interest and any other costs, expenses, or fees to which they may be entitled by law; and

c. Grant the plaintiffs such other and further relief as this Court deems just and proper.


   DATED:  Honolulu, Hawai`i, August 31, 2022.



/s/ Lyle S. Hosoda
LYLE S. HOSODA              KRISTINA S. BAEHR
KOURTNEY H. WONG            JAMES BAEHR
SPENCER J. LAU
THURSTON A. KINO

                            Attorneys for the plaintiffs

54